_____

No. 25-1465
_____


IN THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

SARA DOBBINS
APPELLANT


vs.


BROOKE L. ROLLINS, Secretary
UNITED STATES DEPARTMENT OF AGRICULTURE,


APPELLEE.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI, WESTERN DIVISION

BEFORE THE HONORABLE LAJUANA M. COUNTS, U.S. DISTRICT JUDGE


_____

CORRECTED BRIEF OF APPELLANT

_____

Randles Mata, LLC
Rebecca M. Randles #40149
851 NW 45th Street Suite 310
Kansas City, MO 64116
(816) 931-9901 (816)
931-0134 (FAX)
rebecca@randlesmatalaw.com

ATTORNEY FOR APPELLANT

i

# SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

Sara Dobbins' husband beat her and threatened to kill her. So severe was her abuse that the Kansas City police department put her and her children in a safe place to prevent their murder. Domestic violence caused her post traumatic stress disorder, severe and diagnosable anxiety and depression and the sequelae of those conditions. Instead of accommodating her disability caused by the domestic violence, the USDA harassed Ms. Dobbins, refused to accommodate her disability, violated their own workplace policies regarding FMLA, Disability Accommodation and Domestic Violence, and retaliated against Ms. Dobbins for exercising her rights. The Agency harassed her based on her sex and status as a disabled woman and retaliated against her.

Ms. Dobbins appeals from the grant of summary judgment on her claims against the USDA / RMA for failure to accommodate her disability, discrimination based on sex and disability and for retaliation and wrongful discharge.

Plaintiff requests 20 minutes of oral argument.

ii

# I.TABLE OF CONTENTS

**Table of Content**

SUMMARY OF THE CASE AND REQUEST FOR ORAL ..................... i

ARGUMENT ................................................................................. ii

I.TABLE OF CONTENTS .......................................................... iii

II. TABLE OF AUTHORITIES ................................................<u>v</u>

III. JURISDICTIONAL STATEMENT ......................................1

IV. STATEMENT OF THE ISSUES FOR REVIEW.................2

V. STATEMENT OF THE CASE...............................................5

VI. SUMMARY OF THE ARGUMENT ..................................33

VII. ARGUMENT....................................................................34

A. Standard of Review .......................................................<u>1</u>

B. Exhaustion of Remedies ...............................................34

C. Failure to Accommodate Under the ADA/ Rehabilitaion Act ............38

D. The Court Erred in Determining Plaintiff had not Made a Prima Facie Showing of Harrasment...................................................<u>2</u>

Appellate Case: 25-1465     Page: 3     Date Filed: 11/07/2025 Entry ID: 5576505

**E. The Court Erred in Determining Plaintiff had not Made a Prima Facie Showing of Disparate treatment.** .......................................................3

**F.  Plaintiff Did not Abandon the Retaliation Claim** ..................................4

**VIII. CONCLUSION** ..................................................................................61

**IX. CERTIFICATE OF SERVICE.** ............................................................64

**X. CERTIFICATE OF COMPLIANCE** .....................................................67

iv

Appellate Case: 25-1465     Page: 4     Date Filed: 11/07/2025 Entry ID: 5576505

## II. TABLE OF AUTHORITIES

*Boisclair Corp*., 351 F.3d 361 (8th Cir. 2000)..........................................................46

*Carpenter v. Con-Way Cent. Express, Inc*., 481 F.3d 611 (8th Cir. 2007) ..............61

*Cherry v. Menard, Inc*., 101 F. Supp. 2d 1160, 1167 (N.D. Iowa 2000 ..............2, 32

*Cushman v. Union Pac. R.R*., 203 U.S. Dist. LEXIS 229399 (2023) .................3. 58

*Doane v. city of Omaha*, 115 F.3d 624, 627 (8th Cir. 1997) ………………………...40

*Doll v. Brown*, 75 F.3d 1200, 1203 (7th Cir. 1996) ..........................................37

*EEOC v. Delight Wholesale Co*., 973 F.2d 664 (8th Cir. 1992)...........................2, 34

*Fjellestad v. Pizza Hut of Am., Inc*. 18 F.3d 944 (8th Cir. 1999) ................. 40, 44, 45

*Fox v. Gen. Motors Corp*., 247 F.3d 169, 176 (4th Cir. 2001) ...................................46

*Gardner v. Morris,* 752 F.2d 1271 (8th Cir. 1985*)* .................................................36

*Humphrey v. Mem'l Hosp. Ass'n,* 239 F.3d 1128, 1138 (9th Cir. 2001*)* ..................38

*Hunt v. Cromartie,* 526 U.S. 541 (1999 ....................................................2, 32

*Lake v. Yellow Tranp., Inc.,* 596 F.3d 871, 874 (8th Cir. 2010*)* ........................ *59*

*McDonnell Douglas Corp. v. Green,* 411 .S. 792, 802 – 804, 36 L.Ed. 2d 668, 93

   *S.Ct. 1817 (1983) ...........................................................................3,*

*58 Miles v. Kerry,* 961 F.Supp.2d 272, 286 (D.C. D.C. 2013*)* ......................... *2,*

*33,44 Moses v. Dassault Falcon Jet – Wilmington Corp*., 894 F.3d 911 (8th Cir.

*2018) ..35 National Railroad Passenger Corp. v. Morgan*, 536 U.S.101, 114-15 ,

Appellate Case: 25-1465    Page: 5    Date Filed: 11/07/2025 Entry ID: 5576505

122 S. Ct. *2016, 2073 (2002)2, 3 Neudecker v. Boisclair Corp.,* 351 F.3d 361 (8th Cir. 2000...................................................................................*2*

*Norden v. Samper,* 503 F.Supp.2d 130 (D.C. D.C. 2007 .......................................*38*

*Patrick v. Henderson,* 255 F.3d 914, 915-916 (8th Cir. 2001)* ...............................*34*

*Peebles v. Potter,* 354 F.3d 761, 765 (8th Cir. 2004) ....................................... *37, 39*

*Reeves v. Sanderson Plumbing, Inc.,* 530 U.S. 133, 150 (2000); ..........................*32*

*Rehfeldt v. United States Dep't of Homeland Sec.,* 2024 U.S. App. LEXIS 7119 (9th Cir. 2024) .......................................................................................*42*

*Smothers v. Rowley Masonic Assisted Living  Cmty, LLC.,* 63 F.4th 721, 727 (8th Cir. 2023). ....................................................................................*58*

*Sosa v. Hiroaka,* 920 F.2d 1451, 1456 (9th Cir. 1990)* ..........................................*35*

*Taylor v. Phoenixville Sch. Dist.,* 174 F.3d 142, 163 (3rd Cir. 1999) ......................*46*

*Warf v. United States VA,* 713 F.3d 874, 878 (6th Cir. 2013) .............................*2, 47*

*Weatherly v. Ford Motor Co.,* 994 F.3d 940 (8th Cir. 2021)* ...................................*36*

*Wedow v. City of Kansas City,* 442 F.3d 661, 672 (8th Cir. 2006). ........................*38*

*Weems v. Federated Mut. Ins. Co.,* 220 F.Supp.2d 979 (N.D. Ia. 2002)* .................*35*

*Young v. United Parcel Ser., Inc.,* 575 U.S. 206, 213, 135 S.Ct. 1338, 191 L.Ed.2d 279 (2015) ....................................................................................*3, 57*

*Statutes*

Appellate Case: 25-1465     Page: 6     Date Filed: 11/07/2025 Entry ID: 5576505

*28 U.S.C. § 1291* ......................................................................... *1*

28 *U.S.C. § 1331* ......................................................................... *1*

*29 C.F.R. § 1630.2(i) 1998)*..................................................*40*

*29 U.S.C. Sec. 701* ..................................................................*36*

*42 U.S.C. § 12102(2)* .............................................................*40*

*42 U.S.C. § 12112(a)* ..............................................................*39*

*42 U.S.C. § 2000e-16(c)(C.)*....................................................*33*

*Regulations*

*29 C.F.R. § 1630, App. § 1630.9* .........................................*45*

Appellate Case: 25-1465    Page: 7    Date Filed: 11/07/2025 Entry ID: 5576505

# III. JURISDICTIONAL STATEMENT

A.  This case arises under Title VII and the Rehabilitation Act, conferring federal jurisdiction upon the lower court pursuant to 28 U.S.C. § 1331.

B.  The Court has jurisdiction pursuant to 28 U.S.C. § 1291.

C.  The Honorable LaJuana Counts, United States District Court for the Western District of Missouri, granted Defendant USDA / FPAC Motion for Summary Judgment on

January 6, 2025.  Ms. Dobbins  filed her Notice of Appeal on March 6, 2025.

D.  This appeal is from a final order or judgment that disposes of all parties' claims.

Appellate Case: 25-1465    Page: 8    Date Filed: 11/07/2025 Entry ID: 5576505

## IV. STATEMENT OF THE ISSUES FOR REVIEW

**A.  Standard of Review**

De novo review is appropriate in this case, as it comes before the Court following the grant of Summary Judgment pursuant to Defendant's Motion for Summary Judgment.

*Reeves v. Sanderson Plumbing, Inc.,* 530 U.S. 133, 150 (2000)

*Cherry v. Menard, Inc*., 101 F.Supp.2d 1160 (N.D.Iowa 2000)

*Hunt v. Cromartie*, 526 U.S. 541 (1999

**B.  The Court Erred in Determining that Plaintiff Had Failed to Exhaust Administrative Remedies on her Claims regarding Reasonable Accommodation, Retaliation and Wrongful Discharge.**

*Miles v. Kerry*, 961 F.Supp.2d 272, 286 (D.C. D.C. 2013)

*EEOC v. Delight Wholesale Co*., 973 F.2d 664 (8th Cir. 1992)

*National Railroad Passenger Corp. v. Morgan*, 536 U.S.101, 114-15 , 122 S. Ct. 2016, 2073 (2002)

**C. The Court Erred in Determining that Plaintiff had not made a Prima Facie showing That The Agency Failed to Reasonably Accommodate her Disability.**

2

*Neudecker v. Boisclair Corp.*, 351 F.3d 361 (8th Cir. 2000)

*Warf v. United States VA*, 713 F.3d 874, 878 (6th Cir. 2013)

*National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)

**D. The Court Erred in Determining that Plaintiff had not Made a Prima Facie Showing on Her Claims of Harassment.**

*Young v. United Parcel Ser., Inc*., 575 U.S. 206, 213, 135 S.Ct. 1338, 191 L.Ed.2d 279 (2015).

*Cushman v. Union Pac. R.R.*, 203 U.S. Dist. LEXIS 229399 (2023).

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 – 804, 36 L.Ed. 2d 668, 93 S.Ct. 1817 (1998).

**E. The Court Erred in Determining Plaintiff had not Made a Prima Facie Showing of Disparate treatment.**

*Young v. United Parcel Ser., Inc.,* 575 U.S. 206, 213, 135 S.Ct. 1338, 191 L.Ed.

*McDonnell Douglas Corp. v. Green, 411 .S. 792, 802 – 804, 36 L.Ed. 2d 668, 93 S.Ct. 1817 (1983)*

3

Appellate Case: 25-1465    Page: 10    Date Filed: 11/07/2025 Entry ID: 5576505

**F. Plaintiff Did not Abandon the Retaliation Claim**

*32 Lake v. Yellow Tranp., Inc.,* 596 F.3d 871, 874 (8th Cir. 2010*).*

*Carpenter v. Con-Way Cent. Express, Inc., 481 F.3d 611 (8th Cir. 2007)*

Appellate Case: 25-1465    Page: 11    Date Filed: 11/07/2025 Entry ID: 5576505

**V. STATEMENT OF THE CASE**

Sara Dobbins worked for the USDA 2006 until her termination in 2022 - 17 years. [App. Vol. II 0368; R.Doc. 29-2 at 2]. Ms. Dobbins maintained good performance evaluations, meeting expectations or above until 2022. [App Vol. II. 0356; R.Doc. 29-1 at 2; App Vol. III. 0614;R.Doc. 29-23 at 3]. Bill Burden, Ms. Dobbins supervisor from 2016 until his retirement in 2019, found Ms. Dobbins to be a very good employee - skilled, detailed and "just excellent" in her work. [App. Vol. III 0614;R.Doc. 29-23 at 3].

Mr. Burden retired in 2019. Toward the end of his tenure at USDA, Sara confided in him that her husband had become abusive. [App Vol. III 0614;R.Doc. 29-23 at 3]. In accordance with USDA policy, he gave Dobbins an accommodation for her disabling mental health needs. When he did that, Sara flourished as an employee, fully meeting the expectations of USDA. [App. Vol. III 0614;R.Doc. 29-23 at 3]. Burden learned that some of the other male supervisors were out to get Ms. Dobbins, including Charles Parr. [App. Vol. III 0615;R.Doc. 29-23 at 4]. He warned Ms., Dobbins. [App. Vol. III 0615;R.Doc. 29-23 at 4]. After Bill Burden retired, Ms. Dobbins had a total of nine acting supervisors, but no permanent

5

supervisor. [App. Vol. III 0626;R.Doc. 31 at 11]. The acting supervisors did not abide by Sara's accommodations. [App. Vol. II 0356-364;R.Doc. 29-1 at 6-10]

Charles Parr became Ms. Dobbins "permanent" supervisor in either late August or early September of 2021. [ App. Vol. II 0361 R.Doc. 29-1 at 7]. Within a year, Ms. Dobbins was issued a notice of intent to terminate in July of 2022. [App. Vol. I 0109;R.Doc. 16-8 at 1]. That was subsequently rescinded and on August 19, 2022, Dobbins was issued a second Notice of Intent to Remove [App. Vol. II 0270;R.Doc.16-8 at 162]. On September 1, 2022, Ms. Dobbins was issued a Notice of Paid Administrative Investigative Leave. [App Vol. I.0044;R.Doc. 16 at 5]. At some point in December of 2022, Ms. Dobbins was no longer on the payroll. [App. Vol. I 0045; R.Doc. 16 at 6]. The decision upholding Parr's termination was not issued until January 26, 2023. [App. Vol. III 0601-0612; R.Doc.29-22 at 1-11].

*History of Domestic Violence*

Ms. Dobbins had a long-term marriage but her husband, Josh, spiraled downward into methamphetamine use. [App. Vol. II 0356-0357;R.Doc. 29-1 at 2-3]. He became abusive. [App. Vol. II 356-0357;R.Doc. 29-1 at 3]. He lost his job; his behavior became erratic. There were times he would not let Sara leave the house. He kept her imprisoned. On multiple occasions, he took the relay starter from her car to prevent her from going to work. [App. Vol. II

6

Appellate Case: 25-1465     Page: 13     Date Filed: 11/07/2025 Entry ID: 5576505

0357;R.Doc.29-1 at 3]. Many times, she could not leave her children with him to work. [App. Vol. II 0357;R.Doc. 29-1 at 3]. He and Sara began having financial stresses. They lost their home. After the birth of their second child, Mr. Dobbins' abuse became physical. [App. Vol. II 0357;R.Doc. 29-1 at 3].

He beat her up while she was at home working. He barricaded her in her home and beat her and would not allow her to leave. She could not get away from him. His ten-year-old daughter snuck out of the house, went to a neighbor's home and called 911. [App. Vol. II 0357;R.Doc.29-1 at 3]. The police came and took him to jail. [App. Vol. II 0357;R.Doc.29-1 at 3].

Ms. Dobbins left Joshua and filed for an Order of Protection. Because her mental and emotional health and that of her children was at risk, she began counseling and treatment. [App. Vol. II 0357;R.Doc.29-1 at 3].

On approximately February 2, 2022, Josh posted a threat on Facebook. He threatened to kidnap Sara, take her to her mother's home and kill himself and her in front of the children. He also posted a picture of a gun. [App. Vol. II 0358;R.Doc. 29-1at 4]. Sara's sister-in-law called the police. They had Sara pack a small bag and go immediately into protective custody. [App. Vol. II 0358;R.Doc. 29-1 at 4]. Sara was not given a choice; she packed her bag and left. [App. Vol. II 0358;R.Doc.29-1 at 4.]

7

Later, Ms. Dobbins relayed everything to her supervisor.  Parr gave Ms. Dobbins an AWOL for no call/no show while she was in protective custody with the police. [App. Vol. II 0358;R.Doc. 29-1 at 4].

Josh broke into Sara's apartment, threatening to kill her and then himself. This time, he was arrested and convicted of burglary with the intent to assault her. [App.  Vol. II 0358; R.Doc 29-1 at 4; App. Vol. III 0637 R.Doc 31 at 22]

*Sara's Disabling Condition*

The abuse that Josh meted out caused Sarah and her children serious mental and emotional illness, including Anxiety, Depression and Post Traumatic Stress Disorder, all of which was relayed to the Agency and Parr.  [App. Vol. II 0359; R.Doc. 29-1 at 5 [ App. Vol. III 0638 R.Doc. 31 at 23].  The children began acting in unpredictable ways.  [App. Vol. III 0639 R.Doc. 31 at 24].  On June 19, 2019, Sara requested a Reasonable Accommodation that allowed her a continuation of the flexible work options under which she had been fully successful while Bill Burden was her supervisor, despite her challenges with domestic abuse.  [App.Vol. III 0629;R.Doc. 31 at 14].

*Requests for Reasonable Accommodation*

Ms. Dobbins requested a reasonable accommodation in June of 2019.  It was approved in July of 2019. [App. Vol. III  0629;R. Doc 31 at 14].  In the accommodation she was approved for use of leave for medical conditions,

Appellate Case: 25-1465     Page: 15     Date Filed: 11/07/2025 Entry ID: 5576505

treatment, and appointments with prior approval. She was also allowed a flexible schedule. She chose a schedule that included flex or glide time with telework available. Her desk was to be moved out of a high traffic area to accommodate her medical condition. [App. Vol. II 0360;R.Doc. 29-1 at 6]. The Agency was to reassess the accommodation after six months or as soon as a new supervisor was hired. [App. Vol. II 0360;R.Doc. 29-1 at 6].

In October 2020, Ms. Dobbins sought another accommodation. In that accommodation she sought maximum telework, a set schedule for teleworking, and to limit contact with deliveries, visitors, contractors and technicians. [App Vol. II.0520;R.Doc29-13 at 2]. Her eligibility was approved; no final decision regarding the accommodation itself appears to have ever been made.

Eric Jabs became Sara's supervisor in November 2020. Instead of the approved accommodation, he offered an "interim" accommodation. An interim accommodation is a temporary accommodation until a final accommodation is determined or denied. [App Vol. III 0632;R.Doc. 31 at 17].That interim accommodation essentially took away the earlier accommodation and required Ms. Dobbins to ask each week for any scheduling or leave requests she had for the upcoming week. That worked fine for scheduled appointments, but an individual with PTSD does not know in advance when they will be sick. The "accommodation" was not effective for Dobbins's disability. [App. Vol. II

9

360;R.Doc.29-1 at 6]. She also applied for and was granted intermittent FMLA. [App. Vol. II 360; R.Doc.29-1 at 6] Eric Jabs put her on a 90 day leave restriction, preventing her from taking sick or annual leave without prior approval. [App. Vol. II 360;R.Doc.29-1 at 6]. During these supervisory changes, her disability was not accommodated even though she had been approved in 2019. [App. Vol. II 360;R.Doc.29-1 at 6].

When Parr became Sara's permanent supervisor, Dobbins told him about the domestic violence, her disabling condition and the need for accommodation. He told her that she needed to "leave my problems from home at the door," a refrain he used repeatedly. He also said it was not an agency issue. [App. Vol. II 361;R.Doc.29-1 at 7] He did say he knew Ms. Dobbins had a reasonable accommodation but he did not allow her to use it. [App. Vol. II 361;R.Doc.29-1 at 7].

On September 7, 2021 – less than a month after becoming her supervisor - Parr gave Sara an AWOL for being 15 minutes beyond the 9:00 start time and put her on leave restriction. At the time, her husband was continuing to stalk her even with the order of protection. [App. Vol. II 361; R.Doc.29-1 at 7]. When Parr put Sara on leave restriction, he took away glide time and the ability to use alternative leave for her disabling conditions. [App. Vol. II 361;R.Doc.29-1 at 7]. From that

10

Appellate Case: 25-1465     Page: 17     Date Filed: 11/07/2025 Entry ID: 5576505

time forward, Ms. Dobbins did not have access to the accommodation that had been approved. [App. Vol. II 361;R.Doc.29-1 at 7;App.I 393;R.Doc.29-4 at 2].

*Agency Policy on Accommodation*

The Agency's policy regarding reasonable accommodation is found in departmental regulation DR 4300-008. [App. Vol. II 493 ;R.Doc. 29-11 at 18]. It explains that reasonable accommodations enable a qualified individual with a disability to perform the essential functions of a job. [App. Vol. II 0493; R.Doc. 29-11 at 12].

An agency must provide an effective reasonable accommodation to a qualified employee that has a physical or mental impairment that is known, or made known to the agency and that substantially limits one or more major life activities. [App. Vol. II 0506 R.Doc. 29-11 at 31]. Major life activities include but are not limited to caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, working and commuting to and from work. [App Vol. II 0493; R.Doc. 29-11 at 12] A person is considered to have a targeted disability if their disability is designated on the Office of Personnel Management form 256. [App. Vol. II 0530 R.Doc 29-15 at 2]

11

Appellate Case: 25-1465     Page: 18     Date Filed: 11/07/2025 Entry ID: 5576505

Post-traumatic stress disorder is a targeted disability. [App. Vol. II 0530 R.Doc 29-15 at 2]

A person with a disability who is qualified to perform the essential functions of the position is not entitled to an accommodation of choice, but to an effective reasonable accommodation. [ App. Vol. III 0678 R.Doc 31 at 42]. Reevaluation of an accommodation should not be based solely on a change of supervisor. [App Vol. II 0480; R.Doc. 29-11 at 6] The Agency has set forth the types of accommodations that can be used.  It explains that reasonable accommodations can include change to a work environment or the way a job is customarily performed, including:

- Telework, if the accommodation helps the employee and would not interfere with the essential functions of the employee's position. [App. Vol. III 0635; R.Doc. 31 at 20].

- Adjusting arrival and departure times, changing shift assignments, providing periodic breaks or allowing a part-time schedule or flex time schedule.  [App. Vol. III 0635;R.Doc. 31 at 20].

- Employees with a disability may be permitted to use accrued leave. In appropriate circumstances, an employee may be approved for advanced leave or leave without pay as an accommodation so long as it does not

12

Appellate Case: 25-1465     Page: 19     Date Filed: 11/07/2025 Entry ID: 5576505

cause an undue hardship on the Agency.  [App. Vol. III 0635;R.Doc. 31 at 20].

- Quantity and timeliness measures in performance standards are prorated or adjusted for employees who are on extended approved leave. [App. Vol. III 0636; R.Doc. 31 at 21]

- Reassignment.  The Agency is required to search for and offer any vacant and funded position the employee is qualified. [App. Vol. III 0636; R.Doc. 31 at 21].

Agency Policy on Medical Information and Confidentiality

Only the Agency reasonable accommodation coordinator may determine whether medical information is needed to assess the accommodation request.  The Accommodation Coordinator may request medical information from the employee and, with the employee's permission, the appropriate health professional. [App. Vol. II 0481 R.Doc 29-11 at 6]. Medical information must be sufficient to explain the nature and duration of the illness; the limitations, scope of limitations and restrictions related to the disability; the need for accommodation and how the requested accommodation will assist the person with performing the essential functions of the job. [App Vol. II; 0638 R.Doc. 29-11 at 6].

Appellate Case: 25-1465    Page: 20    Date Filed: 11/07/2025 Entry ID: 5576505

Once a person has identified their disability with the agency, new or updated medical information will only be requested in limited circumstances where the person requests a new accommodation; is observed by the supervisor or manager having difficulties performing essential job functions; has a change in their disabling conditions; has a change to their essential job duties or can no longer perform their essential job duties. [App. Vol 0481 III R.Doc. 29-11 at 6]. Requests for accommodation are considered medical information and must remain confidential. [App. Vol. II 0599 R.Doc 29-17 at 7].

The accommodation coordinator will only disclose information to the person's supervisor as necessary to implement a request. [App. Vol. 0638 R.Doc 29-11 at 6]. Any information disclosed must be no more than necessary to process and implement the request. [App. Vol. III 0554 R.Doc 29-15 at 3] ]. To provide effective accommodation, supervisors are entitled to relevant information that is necessary to understand the person's restrictions and limitations related to the essential job functions. [App. Vol. III 0554 R.Doc 29-17 at 9]

*Requirements for Interactive Process*

The interactive process is a dialogue between the person with a disability and their direct supervisor to determine an effective accommodation. The person with a disability should be consulted. [App. Vol. II 00549;R.Doc. 29-11 at 21].

14

Supervisors must engage in the interactive process. [App. Vol. II 0496;R.Doc. 29-11 at 21]

*Agency Policy on Domestic Violence*

Since the 2012 Obama Executive Order requiring Agencies to promulgate policies to protect victims of domestic violence, the USDA has had a policy regarding providing a supportive, safe work environment for victims of violence and fellow employees.  [App. Vol. II 0549 R.Doc 29-17 at 2].

The USDA recognizes that "The abuse an employee receives at home can lead to lost productivity, higher stress, increased absenteeism and higher health care costs."  The USDA recognizes that domestic violence and stalking are workplace issues that impact the workplace even if the incidents occur elsewhere and that domestic violence creates trauma. [App. Vol. II 0549 R.Doc 29-17 at 2]. USDA requires confidentiality of an employee's situation. [App. Vol. II 0550 R.Doc 29-17 at 3].

Supervisors have specific duties under the Domestic Violence prevention policy, including to:

(1)     Inform employees of USDA/Agency policy regarding domestic violence and prevention.

15

Appellate Case: 25-1465     Page: 22     Date Filed: 11/07/2025 Entry ID: 5576505

(2)    Be cognizant of situations that have the potential to produce violence and promptly address them with all concerned personnel. If physical assault, harassment, interference, intimidation or threat occurs:

    (a)    immediately remove the affected employee(s) from possible or further harm or danger.

    (b)    contact local law enforcement officials and/or any available security personnel;

    (c)    obtain medical treatment for any injuries if necessary;

    (d)    encourage the victim of domestic violence to contact their immediate supervisor to report the incident; and

    (e)    Take all threats seriously.

[App. Vol II 0552 R.Doc 29-17 at 5].

The USDA is not to discriminate against victims of domestic violence. [App. Vol II 0552 R.Doc 29-17 at 5]

The USDA will provide leave and other workplace assistance. The USDA recognizes that victims of domestic violence may need time off to secure medical assistance, legal assistance, counseling or to attend to other matters related to the

16

Appellate Case: 25-1465    Page: 23    Date Filed: 11/07/2025 Entry ID: 5576505

incidents, such as court proceedings, relocation, or safety planning for him/her or for a family member.

The USDA pledges to make every reasonable effort to assist an employee to maintain employment when the employee is experiencing or has experienced domestic violence and will work with the employee to provide paid leave first before requiring an to utilize unpaid leave. [App. Vol II 0525 R.Doc 29-14 at 5].

The USDA will also work with employee to determine if other non-leave related assistance will facilitate the employee's ability to remain safe and maintain his or her work performance, such as, but not limited to modifying work schedules, changing employee's location within the workplace or location of a parking spot, changing phone numbers, arranging telecommuting options, etc. [App. Vol III 0556 R.29-17 at 9].

Work Performance and Conduct: USDA recognizes that employees who are victims of violence may experience temporary difficulty fulfilling job responsibilities. [App. Vol. III 0643; R.Doc. 31 at 28]. If a supervisor becomes aware that an employee's declining work performance or conduct has been impacted by domestic violence (e. g. , an employee may be charged with AWOL for absences arising from domestic violence), USDA will offer support to the employee and work in collaboration with the employee to address the issues and may develop a work plan, provide leave and other accommodations, provide

17

Appellate Case: 25-1465    Page: 24    Date Filed: 11/07/2025 Entry ID: 5576505

referrals to support or advocacy agencies, advise employee of his or her rights regarding unemployment insurance if mandated in state, federal or local law, and maintain a separate and confidential record of employee 's status as a victim of domestic violence to ensure to the victim that his or her rights and privileges of employment are not impacted or compromised as a result of the violence. [App. Vol III 0531 R.29-17 at 9]

An employee is to notify the supervisor of the possible need to take leave or flexible work options. These leave and work options are: Annual leave, Advanced Annual Leave, Sick Leave, Advanced Sick Leave, Leave Without Pay (LWOP), Excused Absence. (Administrative Leave), Family and Medical Leave Act (FMLA), Voluntary Leave Transfer and Bank Programs, Telework and Flexible Work Schedules. [App. Vol III 0525 R.Doc 29-14 at 5] The Agency is tasked with allowing flexibility to maintain safety and work performance. [App. Vol. III 0498 R.Doc 29-11 at 23].

*Agency Policy on FMLA*

Covered Federal employees are entitled to a total of 12 workweeks of unpaid FMLA leave during any 12-month period for a serious health condition of the employee that makes the employee unable to perform any one or more of the essential functions of the employee's position. [App. Vol. III 0535 R.Doc 29-16] at 4] An employee may not retroactively invoke the employee's entitlement to

18

Appellate Case: 25-1465     Page: 25     Date Filed: 11/07/2025 Entry ID: 5576505

FMLA leave, unless they are physically or mentally incapable of invoking the employee's FMLA entitlement during the absence from work for an FMLA qualifying purpose. In that instance, the employee may retroactively invoke the employee's FMLA entitlement within 5 workdays after returning to work. [App. Vol. III 0537; R.Doc. 29-16 at 6]

For regular full-time employees who have an 80-hour bi-weekly tour of duty, the 12 weeks of FMLA are converted to 480 hours. [App. Vol. III 0535 R.Doc 29-6] Employees are entitled to use FMLA leave intermittently when medically necessary for themselves or their family. [App. Vol. III 0535 R.Doc 29-16]. Paid leave may be substituted for FMLA leave without pay. [App. Vol. III 0647 R.Doc. 31 at 32]. Sick leave is an employee entitlement. If the employee invokes FMLA leave for a valid purpose, the employee's request to substitute annual leave for unpaid FMLA leave may not be denied. [App. Vol. III 0647; R.Doc. 31 at 32]. If the employee is unable, due to circumstances beyond the employee's control, to provide notice of the employee's need for leave, the agency may not delay or deny the leave. [App. Vol III 0541 R.Doc 29-16 at 10]. An agency may not require any personal or confidential information other than that specified in regulations. [App. Vol III 0541 R.Doc 29-16 at 10-11]. The FMLA regulations do not require the medical certification to include a diagnosis. [App. Vol. III 0542; R.Doc. 31 at 33].

Appellate Case: 25-1465    Page: 26    Date Filed: 11/07/2025 Entry ID: 5576505

An employee must provide the medical certification no later than 15 calendar days after the date the agency requests it. [App. Vol III 0541 R.Doc 29-16 at 10]. The FMLA statute and regulations do not require the agency receive or approve an employee's FMLA medical certification before the employee may take FMLA leave. [App. Vol II 0541 R.Doc 29-16 at 10]. If an employee is unable to provide medical certification before leave begins, or if the agency questions the validity of the original certification provided by the employee and the medical treatment requires the leave to begin, the agency must provide the employee provisional FMLA notification requirements. [App. Vol III 0634 R.Doc 31 at 19].

*Agency Maxi flex Policy*

Flexing or gliding is a required part of the "maxi flex" policy. Flexing (gliding) is used by employees to vary the arrival/ departure time and may be used to make-up time during the pay period in lieu of a charge to leave. Employees eligible for maxi flex may flex up to two hours each day, based on their MRP-346, without prior supervisory approval. [App. Vol III 0649R.Doc 31 at 34]

*Agency Policy on Court Leave*

The Office of Personnel Management directive provides that all employees are entitled to paid time off without charge to leave for service as a juror or witness. [App. Vol. III 0649; R.Doc. 31 at 34]. A witness is an employee

20

summoned as a witness in a judicial proceeding in which the Federal, State or local government is a party. [App. Vol. III 0649; R.Doc. 31 at 34].

*Violations of Policy Constituting Harassment*

Parr refused to provide Sara with her employment rights as a disabled person under the reasonable accommodation policy, FMLA, the maxiflex policy, the domestic violence policy, and leave policies including court leave, instead using her disability as a punishable offense. [App. Vol. II 364;R.Doc.29-1 at 10; App. Vol. I 113:R.Doc.16-8 at 5]. Parr showed bias toward her in regard to her disabling condition of panic attacks, PTSD and depression resulting from domestic violence and as a female, calling her "little girl" among other dismissive comments. [App. Vol. II 364;R.Doc.29-1 at 10; App. Vol. I 113;R.Doc.16-8 at 5]. In the 7 Day Suspension letter, Parr, in reviewing the Douglas factors for the appropriateness of the proposed discipline, specifically targets the fact that Ms. Dobbins was a domestic abuse survivor as a reason for the discipline. In Section 8, he states: "The notoriety of the offense or its impact upon the reputation of the Agency." Your actions and the recent incident where your ex-husband showing up at the National Grain Center and the police being called creates a negative image for the agency." [App. Vol. I 111;R.Doc.16-7 at 3]. Parr also reports telling Dobbins that while her situation was unfortunate, the matter falls outside the scope of the agency despite the policies to the contrary. He stated that reasonable accommodations do

21

Appellate Case: 25-1465    Page: 28    Date Filed: 11/07/2025 Entry ID: 5576505

not excuse a person from discharging the assigned duty. [App. Vol. III 0653 R.Doc 31 at 38]

Parr used Sara's disability as grounds for discipline including termination. On August 25, 2021, Sara was dropping her son at school. He had seen Josh hit Sara and assault her. When they got to kindergarten, he just totally freaked out. He would not get out of the car. She called Parr to explain what occurred but he used the incident to place her on leave restriction. [App. Vol. III 0650, R.Doc. 31 at 35]

Parr never engaged in any form of interactive process with Ms. Dobbins. [App. Vol. II 387; R.Doc.29-3 at 3]. Parr removed Ms. Dobbins glide time and telework that were part of her reasonable accommodation. [App. Vol. II 361; R.Doc.29-1 at 7; App. Vol. III 388; R.Doc.29-4 at 2; App. Vol. I 175;R.Doc.16-8 at 67]. Parr requested confidential medical information beyond that allowed by FMLA, Reasonable Accommodation or the Domestic Violence policy, requesting her actual records from her provider, with wet ink, directly to him including information regarding her diagnosis. [App. Vol. III 0654 R. Doc 31 at 39[

In the Notice of Leave Restriction dated September 8, 2021, Parr requested Sara to provide to him documentation of the nature of every illness or injury for which she requested leave for him to determine – as opposed to a physician – if

22

sick leave is justified. [App. Vol. I 95-97;R.Doc.16-5 at 1-3]. Parr requested Ms. Dobbins to get medical documentation after the close of business, knowing that the doctor's office was closed. [App. Vol. III 0655 R.Doc 31 at 40].

Parr requested the police report regarding Ms. Dobbins being threatened by her husband to approve leave. [App. Vol. III 0655 R.Doc 31 at 40]. He requested documents from the school to support Ms. Dobbins report that her husband was at her son's school, and she had to go get her son. [App. Vol. III 0655 R.Doc 31 at 40] Parr issued a proposed termination and did actually terminate Ms. Dobbins for 90 days of AWOL that he imposed in violation of policy. [App. Vol III.0602;R.Doc. 29-22 at 2-11]. If Parr had allowed Ms. Dobbins to use FMLA as required by the workplace, she would have had 480 hours of leave available to her. [App. Vol III 0569-0572;R.Doc.29-17 at 22-25] Parr offered no preventative or corrective action on behalf of Ms. Dobbins and denigrated her disability. [App Vol. II .0386;R.Doc. 29-3 at 4].

Despite receiving accommodations, Parr engaged in actions that showed that he did not believe Ms. Dobbins' disability was real and harassed her over it. Ms. Dobbins testified: "I distinctly recall one day when my direct line Supervisor insisted that a symptom of my disability was not real. I told him to believe whatever he wants to believe, but what I am going through is real and I am doing the best I can right now. He said: "You don't know what you have coming for

23

Appellate Case: 25-1465    Page: 30    Date Filed: 11/07/2025 Entry ID: 5576505

you." I responded by asking what do you mean by that? He turned and walked into his office and slammed his door shut. [App. Vol. II 0376;R.Doc.29-2 at 10].

This was not the only time that Charles Parr, Plaintiff's direct supervisor, minimized or made fun of Ms. Dobbins disability as she was struggling with Post traumatic stress disorder, panic attacks, anxiety and depression. His derision of her, her situation and her disability occurred on a regular basis. [App. Vol. II 0376; R.Doc. 29-2 at 10]. Parr asked personal questions of Ms. Dobbins in front of other employees. [App. Vol. II 382-383;R.Doc.29-2 at 16-17]. Parr shared personal information about Sara's issues with a co-worker, whom he brought in to be a 'witness." [App. Vol. II 377;R.Doc.29-1 at 11]. Parr continually made nasty comments to Plaintiff. He asked for Dobbins personal medical and disability information in front of co-workers, he would openly discuss personnel issues in front of them including her time and attendance, and he harassed her over the type of quantity of information she was to provide him from medical professionals. [App. Vol. II 396;R.Doc.29-5 at 3].

Parr waited for Sara at the door and at her desk to monitor when she arrived and then would announce it to everyone in the office. [App.Vol. II 0361;R.Doc. 29-1 at 7]. If she was one minute late, he would yell out to the others in the area that she was late again and he would be charging 15 minutes of AWOL. [App. Vol. II 364;R.Doc.29-1 at 10] Parr refused medical documentation that stated clearly that

24

Appellate Case: 25-1465    Page: 31    Date Filed: 11/07/2025 Entry ID: 5576505

she was incapable of contacting him due to an emergency, giving her three days of AWOL on October 4-6, 2021. [App. Vol. III 0659 R.Doc 31 at 44].

Parr told Ms. Dobbins orally and in writing to contact him with questions. When she did that, he accused her of "challenging" him. On 10/13/2021, Ms. Dobbins asked if she would be entitled to any form of leave to pick up her Linc pass at the Beacon Building, which was 30 minutes each way from her duty location. She asked that question via text and he accused her of being "unreasonably burdensome" on resources while offering little benefit to the agency for asking those question. [App. Vol. III 0659 R.Doc 31 at 44].

Parr called her "Little Girl" when speaking of her domestic abuse issues and the disabling conditions it was causing. [App Vol. II 0364;R.Doc.29-1 at 10-11].

For non-disabled employees, Parr was more lenient. He gave Ms. Liberty 15 minutes of administrative leave on 10/15/2021 when Joshua Dobbins appeared at the worksite but refused the same to Ms. Dobbins. [App. Vol. III 0660 R.Doc 31 at 45]. On 10/23/2021, Parr reassured Ms. Liberty that if the work environment became uncomfortable because of Ms. Dobbins situation, she would be able to utilize her ad hoc telework agreement. [App. Vol. III 0660 R.Doc 31 at 45]. With Ms. Dobbins, he terminated her ability to telework, reminding her on 10/22/2021. [App. Vol. III 0660 R.Doc 31 at 45]. On both occasions, Parr required Ms. Dobbins to stay on premises when her husband showed up – in direct violation of

25

the domestic violence policy on safety and her reasonable accommodation. [App. Vol. III 0641;R.Doc.31 at 26].

On 12/20/21 and 12/27/21, Parr refused Plaintiff FMLA in place of AWOL even though Sara submitted appropriate leave documentation. [App. Vol. III 0660 R.Doc 31 at 46]. On February 2, 2022, and 02/08/2022, Parr addressed Ms. Dobbins potential EEO complaint in a staff meeting. According to his own words, he told staff: "When a supervisor has questions related to operations and work even if it makes an individual uncomfortable, that does not constitute a hostile work environment. I stated that supervisors have rights just as employees do to carry out the duties they have been assigned and that persons making accusations that lack merit could potentially be crossing into slander for verbal statements and liable for written ones." [App. Vol. III 0662 R.Doc 31 at 47]. Ms. Dobbins found his remarks intimidating. [App. Vol. II 0364;R.Doc.29-1 at 10.

Parr counted Dobbins AWOL for time she was subpoenaed to court in violation of USDA policy in March 2022. [App. Vol. I 0174;R.Doc.16-8 at 67]. Parr refused medical documentation from Ms. Dobbins because it did not contain a diagnosis, in violation of the Reasonable Accommodation Confidentiality policy FMLA policy and the Domestic Violence Confidentiality policy on multiple occasions. [App. Vol. I 191-192;R.Doc.16-8 at 88-89]. He also refused to accept

26

notification of use of leave from a third party while Ms. Dobbins was incapacitated by her disability, as required by USDA policy. [App. Vol. I 196-197;R.Doc. 10-8 at 88].

Parr verbally berated Sara for failing to self-report that she had been late. [App Vol. I 0169; R.Doc.16-8 at 61] then later told HR that she was thumbing her nose at the AWOL process and him by self-reporting that she had been 15 minutes late. Ms. Dobbins felt that the requirements were always changing; she was damned if she did and damned if she didn't. [App. Vol II 363;R.Doc.29-1 at 9]. No nondisabled individual was treated the same as Ms. Dobbins.

Dobbins maintained a positive leave balance despite the disability and instability. Parr would not allow her to use it. [App. Vol. I 222;R.Doc.16-8 at 114]. On September 23, Sara became ill. She requested leave and went to minute clinic. There, her doctor took her off work for three days – 9/23, 9/24 and 9/25. She had sufficient sick leave days to cover this illness and provided medical documentation to Parr as he requested. Instead, he proposed discipline for improper use of leave. [App. Vol. II  363;R.Doc. 29-1 at 9].

Mr. Parr began requesting documentation of her medical conditions be sent directly to him by her providers via email. Most will not email medical records because of confidentiality concerns and some objected to providing her personal and private health information to her supervisor. [App. Vol. II 362;R.Doc.29-1 at

27

Appellate Case: 25-1465     Page: 34     Date Filed: 11/07/2025 Entry ID: 5576505

8].  When Parr was met with these objections, he started requesting medical documentation that was not electronically signed by her providers but that was "wet ink" signed.  [App. Vol. II 362;R.Doc.29-1 at 8].

He would not accept medical documentation that listed the dates of service, the type of provider, the restrictions she had and the expected duration.  Instead, he wanted to know what she was being seen for so he could decide whether it was appropriate for sick leave. [App. Vol. II 362;R.Doc.29-1 at 8].  Regarding one incident, he made Ms. Dobbins go back to her health care provider six different times to get documentation that told him exactly what her diagnosis and condition were, in violation of the confidentiality, FMLA and disability policies. [App. Vol. II 362;R.Doc.29-1 at 7-8].

When Sara had to go to a women's shelter, he wanted the name and address of the shelter and the person in charge.  He requested that this person send him the information directly that she was in a shelter and where that shelter was located. [App. Vol. II 362;R.Doc.29-1 at 8].  Women's shelters do not provide a location or address as a way to keep their clients safe from the abusers who chased them there. Parr demanded that information and when she could not provide it, he made it part of the reason for termination. [App. Vol. II 362;R.Doc.29-1 at 8].

On October 5, 2021, a little over a month after  he became her supervisor, Parr removed her ability to telework. [App Vol. II.362;R.Doc.29-1 at 8].  She had

28

been taken to emergency on October 4th because she had a series of panic attacks. On that same day, her daughter was sent home from daycare with a fever. She contacted Mr. Parr the next day, explained what happened and sent him medical documentation from her therapist. Parr refused the documentation stating that there was nothing in the documentation that showed why she was incapacitated, although it did state that she had a series of panic attacks. [App. Vol II.363;R.Doc.29-1 at 9]. He then refused the next documents that she provided to him on the basis that they were not the original documents from the health care provider. He then offered annual leave to pick up original documentation from my health care provider showing my diagnosis that supported being incapacitated the prior days – as long as she did it after the physician's office was closed. When she could not do that, he gave Sara AWOL. [App. Vol. II 363;R.Doc.29-1 at 9].

He counted Sara AWOL for three days because he did not like the documentation she provided from the doctor's office. She then asked for FMLA leave to cover that and was told she was falsifying records by requesting FMLA leave to cover an AWOL that had already been given although the USDA's FMLA policy specifically allows retroactive application in these circumstances. [App. Vol. II 363;R.Doc.29-1 at 9]..

Parr, instead of allowing flexibility as the reasonable accommodation provided, began to monitor every moment of her day. He would give assignments

29

and if they were not done within five minutes, Sara would receive a counseling –

even if she was doing other duties like collecting incoming packages, working the

dock or the phones. [App. Vol II 363;R.Doc.29-1at 9].  Anytime she was late at all,

he would charge fifteen minutes of AWOL whether it was for one minute, eight

minutes or fifteen minutes and regardless of whether it was within glide time under

the Maxi flex policy. [App. Vol II.365;R.Doc. 29-1 at 11].

When Sara requested FMLA leave for medical reasons, he denied it.  [App.

Vol. II 364;R.Doc.29-1 at 10] See also T&A records. [App. Vol. I 220-

225;R.Doc.16-8 at 112-116].  ]. Parr belittled, harassed and embarrassed Sara every

single day. [App Vol. II.364; R.Doc.29-1 at 1-4].  He would wait for her at her desk

and if she was late by a minute, three minutes, fifteen minutes, he would say in

front of colleagues – usually Barbara, Terri and Gail – and he "well, you are

AWOL again.  That's another 15 minutes." [App. Vol. II 364;R.Doc.1 at 10].  He

said out loud in front of everyone, "everyone has problems; you need to leave your

problems outside the door."  He said that all the time. [App. Vol II 364;R.Doc.29-

at 10].  He belittled her and the issue she was facing, saying, "Little Girl, everyone

has problems."  [App. Vol II 364;R.Doc.29- at 10].

Parr talked about Sara being late, her medical documentation, her issues at

home in front of vendors, delivery drivers. [App. Vol. II 364;R.Doc.29-1 at 10].  In

front of her co-workers, he would talk about her medical condition, saying things

30

Appellate Case: 25-1465     Page: 37     Date Filed: 11/07/2025 Entry ID: 5576505

like I need your medical documentation of your depression and anxiety. [App. Vol II 364;R.Doc.29-1 at 10]. Knowing that Sara suffered PTSD and the domestic violence, he would raise his voice to Sara, intimidating her. He would get so loud she would get fearful and shake. When he saw it, he would say, "oh go back to your desk." [App. Vol II 364;R.Doc.29-1 at 10].

Parr badgered her constantly for not calling or asking for advance leave for things that were out of her control like being ushered to a shelter by the Police or being taken to emergency. [App. Vol II 362;R.Doc.29-1 at 8]. "He would almost make fun of me for things that were out of my control. It seemed obvious he did not believe my symptoms were real or debilitating." [App Vol II.364;R.Doc.29-1 at 10]. One time, Sara became overwhelmed at work and was teary. She excused herself and went into the conference room crying over the hostility at work. She told her co-worker who told Sara it was no problem, she had the phones and door covered. A few minutes later Parr came into the conference room while Sara was on the phone with her therapist. When he walked in he asked if she knew he was going to give her fifteen minutes of AWOL. He told her she needed to get his permission. He left then took an AWOL slip to her desk for her to sign. [App. Vol II 362;R.Doc.29-1 at 8].

By December 2021, she had become so distraught that she considered filing an EEO complaint. She thought that she could confide in Terri Liberty that she

Appellate Case: 25-1465     Page: 38     Date Filed: 11/07/2025 Entry ID: 5576505

was considering doing so.  The next day, in the staff meeting in front of the whole staff, he said go ahead and file an EEO. " Go ahead; I know the rules and I know the regulations – so try me."  He intimidated her so much she gave up the notion of filing an EEO.  [App. Vol II 365;R.Doc.29-1 at 11].  Plaintiff's Doctor, Kimberly Lenkite believes Parr has contributed to her PTSD symptoms.  She lost her apartment, had financial issues and lost many months of pay.  [App. Vol II 358;R.Doc.29-1 at 4].

Appellate Case: 25-1465     Page: 39     Date Filed: 11/07/2025 Entry ID: 5576505

## VI. SUMMARY OF THE ARGUMENT

Sara Dobbins suffered a disabling medical condition caused by domestic violence in her household. Instead of accommodating that disability, the Agency, through the supervisors Charles Parr and others, harassed her for having to use leave to protect herself and her children and to get the health care that they needed. She was denied a reasonable accommodation, she was harassed based upon her sex and disability, she treated less favorably than similarly situated non-disabled individuals.

Ms. Dobbins attempted to bring an EEO complaint in December of 2021, but her supervisor got wind of it and publicly berated and threatened her. As a result, she did not.

She went through the EEO process's informal counseling following a Notice of Termination and Notice of Paid Leave pending investigation. She was subsequently separated from the agency. Ms. Dobbins has fully exhausted all administrative remedies on her claims of harassment, discrimination, wrongful discharge, retaliation. The trial court erred in granting summary judgment on her claims.

33

Appellate Case: 25-1465    Page: 40    Date Filed: 11/07/2025 Entry ID: 5576505

<h1 style="text-align:center"><b><u>VII. ARGUMENT</u></b></h1>

**A. Legal Standards**

De novo review is appropriate in this case, as it comes before the Court following the grant of Summary Judgment pursuant to Defendant's Motion for Summary Judgment. *Reeves v. Sanderson Plumbing, Inc*., 530 U.S. 133, 150 (2000); *Hunt v. Cromartie*, 526 U.S. 541 (1999)

Summary judgment should be granted only where "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c.). *Reeves v. Sanderson Plumbing, Inc.,* 530 U.S. 133, 150 (2000); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986); *Bassett v. City of Minneapolis*, 211 F.3d 1097, 1098 (8th Cir. 2000). These requirements are to be applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues. *Cherry v. Menard, Inc*., 101 F. Supp. 2d 1160, 1167 (N.D. Iowa 2000 (collecting cases holding that summary judgment should seldom be used in employment discrimination cases); Bassett, supra at 1098.

**B. The Court Erred in Determining Plaintiff Had Failed to Exhaust Administrative Remedies on Her Claims Regarding Reasonable Accommodation, Retaliation and Wrongful Discharge**

Sara Dobbins literally ran for her life for nearly two years.  Her husband beat her, imprisoned her, threatened to kill her and posted a picture of his intended

34

murder weapon on Facebook. He prevented her from going to work by taking a relay from her car, flattening her tires, and preventing her from leaving the house. As he spiraled deeper into addiction, his erratic and aberrant behavior became completely uncontrolled. She lived with constant fear that she would not see the next day – and she had two tiny children to care for. Sara suffered PTSD as a result, a recognized disability.

At first, her employer assisted her, gave her a safe place. Her supervisor, Bill Burden, accommodated her anxiety, home life instability, her depression and PTSD by being flexible with leave, flexible with start times and flexible with ad hoc telework. USDA policy required as much. As a result, Ms. Dobbins continued to be an excellent employee.

All of that changed when Charles Parr became her supervisor. Instead of giving her a safe place, Parr put her on leave restriction. He took away her reasonable accommodation, never participated in an interactive process, foreclosed all workplace flexibilities and violated the confidentiality provisions of FMLA, the Rehabilitation Act, the Domestic Violence policy and the Reasonable Accommodation policy. Parr harassed Ms. Dobbins because of her disability. He disbelieved her, he disbelieved her descriptions of the abuse she was experiencing and he made her life at work nearly as difficult as her life at home. Her therapist opined that he contributed to her post traumatic stress disorder. These actions all

Appellate Case: 25-1465    Page: 42    Date Filed: 11/07/2025 Entry ID: 5576505

violated the Rehabilitation Act, Title VII and the ADA. She brought this action to vindicate her rights.

Plaintiff fully exhausted her claims. Before bringing suit under Title VII, the ADA or the Rehabilitation Act, a plaintiff must timely exhaust her administrative remedies. See 42 U.S.C. § 2000e-16(c)(C.). For a Federal employee, administrative exhaustion requires the employee to seek informal pre-complaint counseling "within 45 days of the allegedly discriminatory act" in order to try to informally resolve the matter. *Miles v. Kerry*, 961 F.Supp.2d 272, 286 (D.C. D.C. 2013).

Plaintiff timely filed her administrative complaints and the Agency chose the issues to investigate. The bases listed for her formal complaint are discrimination based on sex and disability. During the investigation, these claims were fleshed out. The disability claims investigated included harassment, disparate treatment and failure to accommodate her disability. The sex claim included the frequent denigration and references to Ms. Dobbins as a "little girl" when discussing her post traumatic stress disorder and its etiology. The retaliation claim arose when Ms. Dobbins approached a co-employee and asked about filing a complaint of discrimination. At a meeting with all employees the next morning, Parr yelled at her and told her that she had no chance of being successful in a claim against him. He even intimated that she was harassing him.

36

The Eighth Circuit Court of Appeals has held that certain claims not included in the original charge of discrimination are properly before the court where the claims are clearly "like or related to the substance of the EEOC charge." EEOC v. Delight *Wholesale Co*., 973 F.2d 664 (8th Cir. 1992). See also *Patrick v. Henderson*, 255 F.3d 914, 915-916 (8th Cir. 2001). In determining whether an alleged discriminatory act falls within the scope of a discrimination claim, the administrative complaint must be construed liberally in order not to frustrate the remedial purposes of the anti-discrimination statutes. A plaintiff may seek relief for any discrimination that grows out of or is like or reasonably related to the substance of the allegations in the administrative charge. *Weems v. Federated Mut. Ins. Co*., 220 F.Supp.2d 979 (N.D. Ia. 2002). The jurisdictional scope of a Title VII claimant's court action depends upon the scope of both the EEOC charge and the EEOC investigation. *Sosa v. Hiroaka*, 920 F.2d 1451, 1456 (9th Cir. 1990). In this case, the investigation included clearly the request for accommodation, harassment, disparate treatment, and retaliation. It also included wrongful discharge.

*1. Wrongful discharge*

As a general rule, a Plaintiff cannot rest but must file a complaint of discrimination upon knowledge that he or she is being terminated. See *Moses v.*

Appellate Case: 25-1465   Page: 44   Date Filed: 11/07/2025 Entry ID: 5576505

*Dassault Falcon Jet – Wilmington Corp*., 894 F.3d 911 (8th Cir. 2018)(termination occurs when the employer notifies the employee of the termination). Upon receipt of the notice of intent to terminate, Plaintiff had the duty to file her EEO complaint. That complaint encompasses the entire process of termination. Plaintiff should not be required to exhaust each element of the termination process but the process itself which resulted in termination.

Defendant argued, and the lower court held, that Plaintiff should have amended the complaint after her termination to include it specifically in the complaint instead of relying on the Notice of Intent to terminate. However, in this matter, Ms. Dobbins was functionally terminated before receiving the letter upholding her supervisor's decision. The uncontroverted facts were that Plaintiff was terminated sometime in December before receiving the Notice that the decision to remove had been upheld at the end of January. At the time that she received the notice that the termination was upheld, it was merely pro forma as she had already been separated from the agency. There is no clear termination date.

Further, Ms. Dobbins failure to accommodate claim and the termination are inextricably linked. An EEOC investigation into Dobbins' Termination could reasonably be expected to grow out the charge she filed regarding receiving a Notice of Termination based upon disability and sex discrimination. This case is akin to *Weatherly v. Ford Motor Co*., 994 F.3d 940 (8th Cir. 2021). In Weatherly,

38

the accommodation and termination claims were held to be two sides of the same coin as the request for accommodation was made and was outstanding at the time the termination occurred.  Id.  Likewise, the investigation into the Notice of Intent to Terminate and failure to reasonably accommodate were outstanding and closely connected in time to the termination.

*2.  Failure to Accommodate Fully Exhausted*

The Rehabilitation Act of 1973, 29 U.S.C. Sec. 701 et. seq., prohibits discrimination based on disability, including in employment activities of the federal government and its agencies.  *Gardner v. Morris*, 752 F.2d 1271 (8th Cir. 1985).  The Rehabilitation Act imposes on federal employers "a positive duty of accommodation of any to any known physical or mental handicap of a qualified applicant or employee, as well as the usual negative duty of non-discrimination.  *Doll v. Brown*, 75 F.3d 1200, 1203 (7th Cir. 1996).  The Plaintiff must make a positive showing that she sought a reasonable accommodation that imposes no undue burden on the employer.  *Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004).

In this matter, there is no question that Plaintiff sought a reasonable accommodation from her new supervisor(s) after Bill Burden left.  The accommodation she sought was identical to that which she had and under which she thrived before he retired.

Appellate Case: 25-1465     Page: 46     Date Filed: 11/07/2025 Entry ID: 5576505

Plaintiff did exhaust her administrative remedies.  She alleged disability discrimination in her formal complaint.  The ROI establishes that failure to accommodate – which is a form of disability discrimination -- was investigated in the EEO process.  In the investigative materials, the parties were specifically asked about reasonable accommodation. [App Vol II.0379;R.Doc.29-2 at 13].  Ms. Dobbins attached the counselor's report to the Formal Complaint of discrimination, incorporating it into that charge.  Therefore, not only were the continuing acts part of her complaint, but they were actually investigated during the EEO complaint process.  The lower court indicates that testifying via affidavit in the investigation process about failure to accommodate does not exhaust remedies.  In this, the court erred.  "Courts should consider claims specifically raised and those that are "like or reasonably related to the administrative charges that were timely brought."  *Wedow v. City of Kansas City*, 442 F.3d 661, 672 (8th Cir. 2006).

Ms. Dobbins contended throughout the investigative process that she should have been given a reasonable accommodation instead of given a notice of termination and subsequently terminated.  This is sufficient for exhaustion as it was part of the investigation itself.

Additionally, Parr engaged in a continuing violation of the duty to reasonably accommodate Ms. Dobbins.  The Agency granted Sara accommodation on two separate occasions.  Charles Parr referred to the accommodation, but he

40

never followed it and engaged in actions, as set forth in the statement of facts, that violated the reasonable accommodation policy and constituted ongoing harassment. His actions actively undermined the reasonable accommodation that had been approved. The duty to accommodate is a continuing duty that is not exhausted by one effort. *Norden v. Samper*, 503 F.Supp.2d 130 (D.C. D.C. 2007. See also *Humphrey v. Mem'l Hosp. Ass'n*, 239 F.3d 1128, 1138 (9th Cir. 2001). Charles Parr's acts were continuous and ongoing. He violated the Reasonable Accommodation and USDA policies at least weekly. These violations constituted a continuing pattern of discrimination.

**B. The Court Erred in Determining that Plaintiff Had Not Made a Prima Facie Showing That the Agency Failed to Reasonably Accommodate her Disability.**

The USDA failed to appropriately accommodate Sara's disability beginning in 2019 and continuing through her termination in January, 2023. The Rehabilitation Act provides the sole remedy for employment discrimination based on a disability for federal employees. *Ahmed v. Napolitano*, 825 F.Supp. 2d 112, 115 (D.D.C. 2011). The disability standards set forth in the ADA are largely used to determine whether a violation of the Rehabilitation Act has occurred. *Peebles v. Potter*, 354 F.3d 761, 765 (8th Cir. 2004). A court may treat the case law interpreting them as interchangeable. *Argenyi v. Creighton Univ.*, 703 F.3d 441, 448 (8th Cir. 2013)..

41

*1. Ms. Dobbins has a disability*

Rehabilitation Act and ADA  prohibit an employer from discriminating "against a qualified individual with a disability because of the disability of such individual.  42 U.S.C. § 12112(a).  To establish a claim under either act, a plaintiff must show (1) she is disabled within the meaning of the act; (2) that she is qualified to perform the essential functions of the job either with or without accommodation; and (3) she has suffered adverse employment actions because of the disability.  *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1112 (8th Cir. 1995).

The ADA defines disability as "(a) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (b) a record of such an impairment; or (c) being regarded as having such an impairment."  42 U.S.C. § 12102*(2)*.  Major life activities include caring for one's self, performing manual tasks, walking seeing, hearing, breathing, learning and working.  29 C.F.R. § 1630.2(i) 1998).  The determination of whether an individual is substantially limited in a major life activity must be made on a case-by-case basis.  *Doane v. City of Omaha*, 115 F.3d 624, 627 (8th Cir. 1997).

Under USDA policy, a major life activity is defined broadly and includes walking, seeing, hearing, talking, standing, sitting, reaching , bending, speaking, reading, thinking, lifting, breathing, performing manual tasks and concentrating.

42

Post-traumatic stress disorder is listed on Standard Form 256 incorporated into USDA policy as a "targeted disability" and is considered a physical or mental impairment.

Ms. Dobbins diagnoses included depression, anxiety and Post Traumatic Stress Disorder. Ms. Dobbins not only had mental and physical impairments that qualify as impairments of major life activities, but the diagnoses she carried is a "targeted disability" under the USDA reasonable accommodation policy.

*2. Ms. Dobbins is Qualified*

Plaintiff must next show she was qualified to perform the essential functions of her job with or without reasonable accommodation. *Fjellestad v. Pizza Hut of Am., Inc*. 18 F.3d 944 (8th Cir. 1999). Ms. Dobbins worked for the USDA / AMS for approximately seventeen years. During that time, Ms. Dobbins never received a less than "meets expectations" performance evaluation. Even the supervisor that eventually terminated her, commented that she did a good job when she was present. As Ms. Dobbins' mental health suffered and she dealt with socioeconomic difficulties like being stalked, threatened, beaten, followed, living in a shelter, she managed to maintain sufficiently high-performance standards to meet her employer's expectations when given accommodation. When her life became chaotic and her mental health suffered, she needed the workplace flexibilities offered by the Reasonable Accommodation policy and the Domestic

Appellate Case: 25-1465     Page: 50     Date Filed: 11/07/2025 Entry ID: 5576505

Violence policy to maintain her performance standards. Therefore, she was qualified individual under the ADA / Rehabilitation Act as she was capable of performing the essential functions of her position with accommodations.

### 3. *The Agency failed to Accommodate*

Since she meets the first two criteria required, she must establish that the agency failed to provide her reasonable accommodations. *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1112 (8th Cir. 1995). Ms. Dobbins first requested a reasonable accommodation in 2019 that was granted, offering her flexible leave, telework and "glide" time to accommodate her needs. These accommodations had been provided by her supervisor, Bill Burden. and were successful. After his retirement, Ms. Dobbins had nine supervisors – all of them acting. None of those supervisors maintained the accommodations. In 2020, she made a second request for the accommodation which was granted but never implemented. Ineffective modifications to the work environment are not accommodations. *Rehfeldt v. United States Dep't of Homeland Sec.*, 2024 U.S. Appl. LEXIS 7119 (9th Cir. 2024). In August or September 2021, Charles Parr became her supervisor. Within about 2 weeks of him taking over, he terminated Ms. Dobbins right to telework, he placed her on stringent leave restrictions and he changed her duty hours to times that she could not get her children to school. He knew that she was a single mom, that she was running in fear for her life from her husband, she was

44

financially unstable and precarious in her housing.  He knew she had PTSD, depression and anxiety that was disabling.  He knew of the grant of a Reasonable Accommodation.  Nonetheless, he utterly ignored the Reasonable Accommodation and did the exact opposite of its terms.  Sara was not even given the seven minute glide that other employees received – much less the workplace flexibilities (as described in USDA policy) available to other employees.  The Agency created substantial hurdles to Ms. Dobbins' approved accommodations.

Between July 2019 and January 2023, no action was taken to actually create the approved accommodations, although policy requires action within 30- days in most circumstances.  Plaintiff's supervisors were hostile to Ms. Dobbins' request for accommodation.  Parr repeatedly expressed his disbelief that she had a disabling condition.  He minimized and almost laughed about it.  He was belittling and pejorative, telling her "Little girl" she needed to leave her issues from home out of the workplace.

Ignoring her conditions made them worse.  Her PTSD, depression and anxiety became so debilitating she began having panic attacks and crying spells at work.  When Ms. Dobbins had to take time for emergencies, doctor appointments or even for her physical safety, her supervisor expressed disbelief and made impossible demands on her health care providers and Ms. Dobbins.  He wrote her

45

Appellate Case: 25-1465     Page: 52     Date Filed: 11/07/2025 Entry ID: 5576505

up as AWOL if her physicians could not immediately send directly to him her health care records with "wet ink" (not digital) signatures.

The Agency required Ms. Dobbins to continually seek more medical information for disabilities known to them, in violation of USDA policy. The requests became so persistent and demanding that that her providers complained. Ms. Dobbins had to ask a provider six times for documentation to meet her supervisor's outrageous demands regarding one absence. Her supervisor required records directly to him immediately upon return, every time Ms. Dobbins sought leave, although the USDA policy states that an individual may provide them within five days. The Policy and the Rehabilitation Act eschew any requirement that the treatment reports be provided immediately and the confidentiality provisions limit the information a supervisor may receive.

The evidence adduced establishes that the Agency failed to accommodate Ms. Dobbins's disabilities, instead creating barriers to receiving appropriate accommodations.

### 4. Reasonable Accommodation was Possible

Plaintiff is required to make a facial showing that reasonable accommodation s possible. *Benson v. Northwest Airlines, Inc*., 62 F.3d 1108, 1112 (8th Cir. 1995). Plaintiff had been fully successful in her responsibilities when Bill Burden allowed her the workplace flexibilities that are available under Agency

46

policy.  The Agency can point to nothing in the record that would show Ms. Dobbins's job performance would have been inadequate if she were permitted the flexibility found in her RA and to telework ad hoc during PTSD flare ups.  Ms. Dobbins's case is on all fours with *Mobley v. St. Luke's Health Sys. Inc*., 53 F.4th 452, (8th Cir. 2022), a case in which a supervisor sought an accommodation through telework when dealing with his Multiple Sclerosis flare ups.  The Court denied summary pointing to instances in which Mobley was allowed to telework and his performance did not suffer  *Id.*

Since Plaintiff has shown that a reasonable accommodation is possible, the burden of production shifts to the Agency to show that it is unable to accommodate Ms. Dobbins.  *Fjellestad v. Pizza Hut of Am., Inc*. 18 F.3d 944 (8th Cir. 1999)..  Defendant did not meet that burden as it did not explore options.  USDA policy requires HR to look for accommodations including reassignment.  That did not occur.  It also did not and cannot demonstrate that an accommodation would impose an undue hardship on the operation of the Agency.  See *Fjellestad v. Pizza Hut of Am., Inc*. 18 F.3d 944, 952 (8th Cir. 1999).

5.  *Failure to Engage in Interactive Process*

Parr never engaged in an interactive process with Ms. Dobbins.  The EEOC's interpretive guidelines state that: "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer

47

Appellate Case: 25-1465     Page: 54     Date Filed: 11/07/2025 Entry ID: 5576505

must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the employee with a disability." 29 C.F.R. § 1630, Appl. § 1630.9. The 8th Circuit has held that the failure of an employer to engage in an interactive process to determine whether reasonable accommodations are possible is prima facie evidence that the employer may be acting in bad faith. *Fjellestad v. Pizza Hut of Am., Inc*. 18 F.3d 944, 952 (8th Cir. 1999)..

From at least 2019 forward, the agency knew that Ms. Dobbins was suffering from a targeted disability. The Agency did not make a good faith effort to assist Ms. Dobbins in seeking accommodation. Ms. Dobbins could have been accommodated but for Parr's lack of good faith, binding the agency.

Summary judgment is typically precluded when there is a genuine dispute as to whether the employer acted in good faith and engaged in the interactive process of seeking reasonable accommodations. *Taylor v. Phoenixville Sch. Dist.,* 174 F.3d 142, 163 (3rd Cir. 1999); *Fjellestad v. Pizza Hut of Am., Inc.* 18 F.3d 944, 952 (8th Cir. 1999).

On Plaintiff's Count I, Failure to Accommodate, the Agency's lack of good faith in the interactive process and it's failure to provide an adequate

48

Appellate Case: 25-1465     Page: 55     Date Filed: 11/07/2025 Entry ID: 5576505

accommodation to plaintiff doom its Summary Judgment motion.  The Court should deny the motion on this count.

*D.  The Court Erred in Determining that Plaintiff Had Not Made A Prima Facie Showing on Her Claims of Harassment.*

Disability harassment in the workplace is an actionable claim under the Rehabilitation Act and the ADA.  See *Fox v. Gen. Motors Corp*., 247 F.3d 169, 176 (4th Cir. 2001); *Neudecker v. Boisclair Corp*., 351 F.3d 361 (8th Cir. 2000). (hostile environment claims for disability harassment are actionable under the ADA).  Sex harassment is viable under Title VII.  For each basis, to establish a hostile work environment claim, a plaintiff must prove 1) she was a member of the protected class or was disabled; 2) she faced unwelcome harassment based on her sex and / or disability; 3) the harassment had the effect of unreasonably interfering with her work performance and created an objectively intimidating, hostile or offensive work environment, and 4) her employer is liable.  *Warf v. United States VA,* 713 F.3d 874, 878 (6th Cir. 2013).

Plaintiff meets all three elements.  Sara was a person with a recognized disability under the ADA and a targeted disability under USDA policies because of her diagnosis of PTSD.  Her supervisor, Charles Parr, harassed her based on her

Appellate Case: 25-1465     Page: 56     Date Filed: 11/07/2025 Entry ID: 5576505

sex and disability. He called her "little girl." He repeatedly told her that she needed to leave her problems at the door; it was not an agency issue. Parr offered no preventative or corrective action on behalf of Ms. Dobbins and was part of a cabal of male supervisors out to get her, according to Bill Burden. Parr, instead of allowing her flexibility as the reasonable accommodation provided, began to monitor every moment of her day. Examples include:

Giving assignments and if they were not done within five minutes, she would receive a counseling – even if she was doing other duties like collecting incoming packages, working the dock or the phones.

Anytime she was late at all, he would charge fifteen minutes of AWOL whether it was for one minute, eight minutes or fifteen minutes. [App. Vol. III 0620 R.Doc 31 at 51]. She wasn't even allowed the seven minute glide time given other employees. Parr admits as much in his submission supporting her termination. [App. Vol I 175;R.Doc.16-8 at 67].

Parr waited for her at the door or her desk to monitor when she arrived; then would announce it to everyone in the office. He would say in front of colleagues – usually Barbara, Terri and Gail – "well, you are AWOL again.

50

That's another 15 minutes." Parr belittled, harassed and embarrassed Sara every single day. [App. Vol. III 0667 R.Doc 31 at 52].

In front of her co-workers, he would talk about her medical condition, saying things like "I need your medical documentation of your depression and anxiety." He asked for Dobbins personal disability information in front of coworkers.

Dobbins recounted a specific incident in the ROI: "An employee with whom I had good rapport was brought in by my supervisor as a witness. There he told them personal information about the issues I was having that I would not have wanted to share. He openly discuss personnel issues about Sara to others, including her time and attendance, and he harassed her over the type and quantity of information she was to provide him from her medical professionals.

He said all the time, out loud. in front of everyone, "everyone has problems; you need to leave your problems outside the door. He publicly said, "Little Girl, everyone has problems." He would talk about her being late, her medical documentation, her issues at home in front of vendors, delivery drivers. He would say in front of co-workers, vendors and drivers "You missed a package again"; or, "she missed a package earlier in the morning because she was late."

On September 7, Parr placed Ms. Dobbins on leave restriction for being late on two occasions. On the first occasion, she was late because her little boy would

51

Appellate Case: 25-1465      Page: 58      Date Filed: 11/07/2025 Entry ID: 5576505

not get out of the car on the first day of Kindergarten. She arrived 20 minutes late. She called Parr and tried to explain. His response was that with the exception of her previously established reasonable accommodation of an adjusted schedule all other matters fall outside the scope of the agency.[App. Vol. II 361, R.Doc 29-1 at 7] Nonetheless, he refused to allow her the adjusted schedule which would have provided up to 2 hours of glide time. She was fifteen minutes late on September 7, 2021. He used the incidents as reason to place her on leave restriction. In the leave restriction, he took away all glide time and her ability to use alternative leave for her disabling conditions. From that day forward, Ms. Dobbins did not have access to even the leave policies available to all other employees, including a seven-minute glide time and ability to use alternative leave. That accommodation was necessary as just a few days later, Ms. Dobbins husband made threats to kill her and himself in front of their children. He went to their son's school to try to get him and showed up at her work. Parr made no exceptions, violating multiple USDA policies.

On 10/13/2021, Parr received a phone call from a police officer indicating that she would not be able to make it to work. Despite that, Parr requested the police report regarding Ms. Dobbins being threatened by her husband to approve her leave.

52

Appellate Case: 25-1465    Page: 59    Date Filed: 11/07/2025 Entry ID: 5576505

When Sara had to go to a women's shelter for safety, he wanted the name and address of the shelter and the person in charge. Women's shelters do not provide a location or address as a way to keep their clients safe from the abusers who chased them there. Parr demanded that information and when Sara could not provide it, he again berated her then made it part of the reason for the notice of termination and termination.

He requested documents from the school to support Ms. Dobbins report that her husband was at her son's school and she had to go get her son. When on October 15, Ms. Dobbins explained she was still having issues with her husband, Parr told her that her start time was 9:00 a.m.

On two occasions, Parr allowed Ms. Dobbins co-worker, Terri Liberty, to leave early and / or to telework because Sara's ex-husband came to the facility. On both occasions, Parr required Ms. Dobbins to stay – in direct violation of the domestic violence policy on safety and her reasonable accommodation.

On 10/23/2021, Parr reassured Ms. Liberty that if the work environment became uncomfortable because of Ms. Dobbins situation, she would be able to utilize her ad hoc telework agreement.

Appellate Case: 25-1465　　Page: 60　　Date Filed: 11/07/2025 Entry ID: 5576505

Dobbins was treated differently. The prior day, he reminded Ms. Dobbins he had terminated her telework agreement and she could not use ad hoc telework if her husband came to the facility.

On October 5, 2021 Parr removed Ms. Dobbins telework that was part of her reasonable accommodation. Sara had been taken to the emergency room on October 4th because she had a series of panic attacks that rendered her incapacitated. On that same day, her daughter was sent home from daycare with a fever. She contacted Mr. Parr the next day, explained what happened and sent him medical documentation from her therapist. Parr refused the documentation stating that there was nothing in the documentation that showed why she was incapacitated. Sara went back to her therapist for documentation and he refused them on the basis that they were not the original documents from the health care provider. He offered Sara annual leave to pick up original documentation from her health care provider showing her diagnosis that supported being incapacitated the prior days. He told her it had to be done after hours -- after the physician's office was closed. When she could not do that, he gave Sara AWOL. He also removed her telework accommodation. Sara asked for FMLA leave to cover her illness and

54

was told she was falsifying records by requesting FMLA leave to cover an AWOL that had already been given although policy allows it in a situation such as this one.

Parr requested confidential medical information beyond that allowed by FMLA, Reasonable Accommodation or the Domestic Violence policy, requesting her actual records from her provider, with wet ink, directly to him - including information regarding her diagnosis. FMLA leave requires documentation of the dates of service, the type of provider, the restrictions she had and the expected duration. Parr exceeded that, and, Parr, in violation of the confidentiality provisions of the USDA reasonable accommodation policy, FMLA and the Domestic Violence policy required to know exactly why she was being treated including the diagnosis. In the leave restriction itself, Parr requests Ms. Dobbins to provide to him documentation of the nature of every illness or injury for which she requested leave for him to determine – as opposed to a physician – if sick leave is justified.

On multiple occasions, Parr refused medical documentation from Ms. Dobbins because it did not contain a diagnosis, in violation of the Reasonable Accommodation Confidentiality policy FMLA policy and the Domestic Violence Confidentiality policy. He documents his own refusals in the documentation used to support her discipline and termination.

55

Appellate Case: 25-1465     Page: 62     Date Filed: 11/07/2025 Entry ID: 5576505

*AWOL*

Ms. Dobbins was eventually terminated for allegedly being AWOL for 90 hours of AWOL.  Parr set up those AWOLs in the following ways:

Parr disallowed glide time that was part of her reasonable accommodation.

Parr counted Dobbins AWOL for time she was subpoenaed to court in violation of USDA policy in March 2022.  [App. Vol. III 0707 R.Doc 31 at 47] Parr did not allow Dobbins to use "workplace flexibilities" for survivors of domestic violence or accommodation for disabilities..  [App. Vol. III 0655 R.Doc 31 at 40].

If Parr had allowed Plaintiff to use FMLA leave as required by the USDA policies, she would have had 480 hours of leave available to her.  Even with the manner that Parr charged leave, she would have had more than enough to cover her time.

Parr required documentation in excess of FMLA requirements.  On 12/20/21 and 12/27/21, Parr refused Plaintiff FMLA in place of AWOL even though she had submitted FMLA compliant documentation.

56

Parr refused to allow Dobbins to use her own leave to cover instances when she had to leave for appointments, run for her life, to see her doctors or for emergencies in violation of both FMLA and the Reasonable Accommodation policies as well as the domestic violence policies.

On September 23, Sara became ill. She requested leave and went to minute clinic. There, her doctor took her off work for three days – 9/23, 9/24 and 9/25. She had sufficient sick leave days to cover this illness and provided medical documentation to Parr as he requested. Parr used it as evidence of improper use of leave in the subsequent discipline he proposed. One time, Sara became overwhelmed at work and was teary. She excused herself and went into the conference room crying over the hostility at work. A few minutes later Parr came into the conference room while Sara was on the phone with her therapist. When he walked in he asked if she knew he was going to give her fifteen minutes of AWOL. He told her she needed to get his permission. He left then took an AWOL slip to her desk for her to sign.

*Harassment by Gaslighting Plaintiff*

Parr continually placed Ms. Dobbins in double binds – telling her what to do in minute detail then berating her, counseling her or using those actions as grounds

57

Appellate Case: 25-1465     Page: 64     Date Filed: 11/07/2025 Entry ID: 5576505

for termination.  Examples abound in the paperwork he submitted in support of his decision.  Some examples include:

Parr told Dobbins orally and in writing to contact him with questions.  When she did that, he accused her of "challenging" him..

On 10/13/2021, Ms. Dobbins asked if she would be entitled to any form of leave to pick up her lincpass at the Beacon Building, which was 30 minutes each way from her duty location.  She asked that question via text and he accused her of being "unreasonably burdensome" on resources while offering little benefit to the agency for asking those question.

Parr verbally berated Sara for failing to self-report that she had been late.  Following that incident, Ms. Dobbins did self-report being 15 minutes late.  Parr told HR that she was thumbing her nose at the AWOL process and him by self-reporting that she had been 15 minutes late.

*Motivated by Disabling Condition*

Parr showed bias toward her both in regard to her disabling condition of panic attacks, PTSD and depression, in her status as a domestic violence survivor and as a person with an approved reasonable accommodation.  In the 7 Day

58

Suspension letter, Parr, in reviewing the Douglas factors for the appropriateness of the proposed discipline, specifically targets the fact that Ms. Dobbins was a domestic abuse survivor as a reason for the discipline. In Section 8, he states:

> "The notoriety of the offense or its impact upon the reputation of the Agency." Your actions and the recent incident where your ex-husband showing up at the National Grain Center and the police being called creates a negative image for the agency." [App. Vol., 106; R.Doc 16-7 at3]

Sara had taken Parr into her confidence. He knew about the PTSD and how it affected Ms. Dobbins. He knew about the domestic violence. Knowing that, he would raise his voice to Sara, intimidating her. He would get so loud she would get fearful and shake. When he saw it, he would say, "oh go back to your desk."

These types of actions occurred on a regular, ongoing and daily basis. Parr himself documented many events in which he engaged in harassment of Ms. Dobbins. She has established the acts were severe and pervasive. They were objectively offensive to a reasonable person in Ms. Dobbins position. Even the USDA regulations on domestic violence recognize the impact that this kind of harassment can engender on one suffering from PTSD, a recognized disability.

Ms. Dobbins suffered tangible adverse consequences from his behavior as he counted her AWOL instead of using a workplace flexibility like FMLA, Annual or

Appellate Case: 25-1465    Page: 66    Date Filed: 11/07/2025 Entry ID: 5576505

Sick leave when she was absent due to her disability.  She lost over three months of pay and was evicted from her apartment, requiring her to move in with her mother.

Given these facts, summary judgment on Plaintiff's harassment claims would be inappropriate.

### E. The Court Erred in Determining Plaintiff had not Made a Prima Facie Showing of Disparate Treatment

A party may prove intentional discrimination under the ADA either by direct or indirect evidence.  *Young v. United Parcel Ser., Inc*., 575 U.S. 206, 213, 135 S.Ct. 1338, 191 L.Ed.2d 279 (2015).  Ms. Dobbins has direct evidence of the discrimination.  Parr's comments about leaving her home issues out of the workplace, his "little girl" comments and his continual doubting her about her disability constitutes some direct evidence of disability and sex discrimination. This evidence directly reflects the discriminatory attitude and motivation of Parr.

A second way to establish the disparate claim is through indirect evidence and the application of the McDonnell Douglas framework.  *Cushman v. Union Pac. R.R.*, 203 U.S. Dist. LEXIS 229399 (2023).  See *McDonnell Douglas Corp. v. Green,* 411 .S. 792, 802 – 804, 36 L.Ed. 2d 668, 93 S.Ct. 1817 (1983).  The first step in the analysis places the burden of production on the plaintiff to establish a prima facie case of discrimination by showing that: (1) she is a member of a protected class; (2) she was qualified for her position; 3) she suffered an

60

employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination on the basis of membership in the protected class. *Id*. Ms. Dobbins can show the fourth element by showing pretext.  Pretext can be shown by establishing that an employer 1) failed to follow its own policies; 2) treated similarly situated employees in a more favorable manner or that it shifted its explanation of the employment decision. *Smothers v. Rowley Masonic Assisted Living  Cmty, LLC.*, 63 F.4th 721, 727 (8th Cir. 2023).

Sara was a female with a targeted disability of Post Traumatic Stress disorder under USDA policy.  She is within the protected class.  That she was qualified for her position is shown through her performance appraisals and the testimony of Bill Burden that with an accommodation, she was extremely successful in her position. Ms. Dobbins suffered an adverse employment action when she lost money when she was placed on AWOL and when her position was terminated.

Other employees – especially Ms. Liberty, a non-disabled female – were treated more favorably than she.  As an example, when Plaintiff's husband came to the facility in violation of the order of protection, Ms. Liberty was given ad hoc telework and administrative leave so that she would feel safe and "heard."  Ms. Dobbins was denied both even though she was the one at risk by Joshua and the Agency policy required a safety plan for her circumstances.  Likewise, no other

Appellate Case: 25-1465     Page: 68     Date Filed: 11/07/2025 Entry ID: 5576505

employee was berated, denigrated, humiliated, asked about their medical conditions in front of others, had personnel matters discussed with whomever walked through the door including postal service drivers. Parr did not wait at the door or at the desk of any other employee and did not engage in the harassing behaviors set out above with any other employee. Instances of pretext abound in this case. Pretext may be proven "among other ways by showing that an employer (1) failed to follow its own policies; (2) treated similarly situated employees in a disparate manner or (3) shifted its explanation of the employment decision." *Lake v. Yellow Tranp., Inc*., 596 F.3d 871, 874 (8th Cir. 2010). As set forth in the statement of facts, Parr violated each of the policies of the USDA designed to afford disabled individuals the same privileges of employment as non-disabled individuals. He violated the Reasonable Accommodation policies, FMLA policies, medical confidentiality policies, and the domestic violence policies in his quest to terminate Sara. He also violated the anti-harassment policies.

The AWOLs, conduct issues, absences were all pretextual. If Ms. Dobbins had been allowed the reasonable accommodation, none of those would have occurred. Parr docked Ms. Dobbins fifteen minutes each time she was even one minute late. Adding up the fifteen minute increments and the days in which Ms.

62

Dobbins provided appropriate medical documentation that was refused, Ms. Dobbins missed 90 hours of work due to her disability  Under FMLA, she was entitled to 480 hours of leave. Further, the leave restriction on which Parr placed her prevented her from using her other leave to cover the days she was hospitalized, at emergency care or otherwise caring for her disability. She had a positive leave balance throughout his tenure as her supervisor.  Given all of these facts, Ms. Dobbins has established a prima facie case of disparate treatment and summary judgment should be denied.

Ms. Liberty, a non-disabled female employee, was treated more equitably than Plaintiff as were all of the men in the office.  She was the only individual targeted by Parr in such demeaning ways.

## F.  Plaintiff Did not Abandon the Retaliation Claim

Sara started to file a complaint of discrimination in December, 2021.  She discussed it with Ms. Liberty.  The very next day, Parr screeched at her in a meeting in front of all of her colleagues, daring to file a complaint and threatening her if she did.  As a result, she did not file the complaint.  The anti-retaliation provision of Title VII seeks to prevent employer interference with unfettered access to Title VII's remedial mechanisms.  It does so by prohibiting employer actions that are likely to "deter victims of discrimination from complainting to the

Appellate Case: 25-1465     Page: 70     Date Filed: 11/07/2025 Entry ID: 5576505

EEOC." *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611 (8th Cir. 2007). Parr's actions frightened Ms. Dobbins from exercising her rights and potentially saving her job. These allegations are contained in the report of investigation and were fully investigated.

## VIII. CONCLUSION

Plaintiff has established that she was subjected to ongoing harassment, disparate treatment, retaliation, wrongful discharge and failure to accommodate her disability based on sex and disability. The Trial Court erred in granting summary judgment on those claims. For the above and foregoing reasons, this Court should reverse and remand this matter for trial.

64

Respectfully submitted,


/s/ *Rebecca M. Randles*
Rebecca M. Randles,, MO #40149
RANDLES MATA, LLC
851 NW 45th Street Suite 310
Kansas City, Missouri 64116
(816) 931-9901 (816) 931-0134
rebecca@randlesmatalaw.com

ATTORNEY FOR APPELLANT

65

# IX. CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Rebecca M. Randles
Attorney for Plaintiff/Appellant

66

# X. CERTIFICATE OF COMPLIANCE

COMES NOW Plaintiff/Appellant and, with regard to Plaintiff/Appellant's Brief, hereby states the document complies with the typeface requirements of Fed.R.App.P.32(a)(5) and the type-style requirements of Fed.R.App.P.32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word 365 in 14-point Times New Roman, and excluding the parts of the document exempted by Fed.R.App.P.32(f), the document contains 12,889 words.

/s/ Rebecca M. Randles
Attorney for Plaintiff/Appellant

67